**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

RAM D. GOPAL,

    *Plaintiff*,

    v.

UNIVERISTY OF CONNECTICUT ET AL.

    *Defendants.*

No. 3:19-cv-1810 (OAW)

<u>**ORDER DISPOSING OF MOTIONS FOR SUMMARY JUDGMENT**</u>

This is a lawsuit arising out of an employment relationship between Ram D. Gopal ("Dr. Gopal" or "Plaintiff") and the University of Connecticut ("UConn" or the "University"). Plaintiff alleges the University and its agents, President Susan B. Herbst, Provost Craig Kennedy, Dean John Elliott,[1] Associate Compliance Officer Bruce Gelston, and Spokesperson Stephanie Reitz (collectively, "Defendants") unlawfully discriminated against him on the basis of his race, color, and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000(e) *et seq.* ("Title VII") and further violated 42 U.S.C. § 1983 and the Fourteenth Amendment by denying him due process and violating the Equal Protection Clause.

On October 25, 2021, Defendants filed their motion for summary judgement. ECF No. 121. Plaintiff responded with a cross-motion for summary judgment on November 4, ECF No. 125, and an opposition to Defendants' motion on December 10, ECF No. 130. Defendants filed a reply in support of their motion on December 20, ECF No. 135, and an

---

[1] The court notes that Defendant Elliott's name appears misspelled on the docket. *See* John A. Elliott, University of Connecticut, available at https://www.business.uconn.edu/person/john-elliott/ (last accessed March 30, 2025).

opposition to Plaintiff's cross-motion on December 27, ECF No. 141.  The following day, this case was transferred to the undersigned.  ECF No. 144.  Finally, on January 13, 2022, Plaintiff filed a reply in support of his cross-motion for summary judgment.  ECF No. 145. Taken together, the filings from the parties span appoximately 2,500 pages in length.

Having carefully reviewed those voluminous materials, and also for the following reasons, the court hereby **GRANTS** Defendants' motion for summary judgment and hereby **DENIES** Plaintiff's motion for summary judgment.

## I.    BACKGROUND

### A. PARTIES

While neither party so stated in its statements of material fact, it appears to be uncontested that Dr. Gopal is a brown-skinned, Asian-American man.  *Compare* ECF Nos. 120-1, pg. 15 and 125, pg. 7; ECF No. 125-5, Kennedy Dep.  Tr. 43:3-16.[2]  His UConn employment began on September 1, 1993, he became a tenured professor and Department Head of the Department of Operations and Information Management ("OPIM") within the University's business school, and his employment ended on August 29, 2018.  ECF No. 125, pgs. 1, 7; ECF No. 141 pg. 20.

Defendant University of Connecticut is a public university in the State of Connecticut.  During the relevant period, Defendant Susan Herbst ("Herbst") was its President and Defendant Craig Kennedy ("Kennedy") was its Provost, while Defendant John Elliott ("Elliott") was the Dean of UConn's School of Business.  Additionally, Defendant Bruce Gelston ("Gelston") was an investigator and Associate Compliance

---

[2] All pagination herein is as generated by the court's CM/ECF system, and from any document therein.

Officer within the Office of University Compliance ("OUC"), while Defendant Stephanie Reitz ("Reitz") was UConn's Spokeswoman.

### B. FACTS

Before turning to the facts relevant to the court's review of what it already has estimated to be some 2,500 pages of briefs and related materials, it is worth sharing the following legal argument between opposing counsel, taken from the transcript of a deposition in this case:

> MR. BREWER: No, I'm not.
> MS. BROUILLET: Yes, you are.

ECF No. 130-5, pg. 23 (Kennedy Dep. Tr. 50:11–12).  The foregoing appeared between outbursts the court reporter classified as "(unreportable simultaneous crosstalk)" within excerpts of the transcripts provided by Plaintiff's counsel.  *See id.* at 24 (Tr. 53:1), 29 (Tr. 62:1), and 32 (Tr. 119:20).

When parties lament delays in the issuance of a court ruling, they should know that judges in that very moment might be reviewing passages such as this one, in a case with a record just as voluminous.

To dispel any notion of exaggeration, another passage from that same deposition reads as follows:

> MS. BROUILLET: I have . . . an appropriate objection to the form of the question.
>
> MR. BREWER: No, it is not.
>
> MS. BROUILLET: It absolutely is.  And if you don't like it we can always take that up with the [c]ourt rather than arguing.
>
> MR. BREWER: You'd love to do that, right?

*Id.* at 33 (Tr. 120:2–10). In the interest of time, at least for now, the court will avoid further reference to these contentious exchanges but assures the reader that they exist. *See, e.g.,* ECF Nos. 130-5, 141-8 (Kennedy Dep. Tr. 48:1–62:10, 120:2–10, 161:1–12, 162:24–25); ECF Nos. 121-6 (Gopal Dep. Tr. 211:2–213:7).

### 1. Relevant Policies

#### a. *Policy Against Discrimination, Harassment and Related Interpersonal Violence*

The University's Policy Against Discrimination, Harassment and Related Interpersonal Violence defines "Amorous Relationships" as an "intimate, sexual, and/or any other type of amorous encounter or relationship, whether casual or serious, short-term or long-term." ECF No. 121-11, pg. 94. It prohibits "all faculty and staff from pursuing or engaging in amorous relationships with employees whom they supervise" and specifically warns supervisors from initiating or participating in "institutional decisions involving a direct benefit or penalty (employment, retention, promotion, tenure, salary, leave of absence, etc.) to a person with whom that Individual has or has had an amorous relationship." *Id.*, pgs. 95-96.

#### b. *Travel Policy*

The University's Travel Policy provides, "[e]mployees can be reimbursed for travel and entertainment expenses related to legitimate University business . . . expenses must be reasonable and appropriate to the circumstances." ECF No. 126-1, pg. 10. "To be reimbursed, Travelers are requested to submit a Travel WebForm, along with all supporting documentation to the Office of Travel Services within fifteen days of returning from a trip." ECF No. 120-3, pg. 129. "To avoid actual or apparent conflict of interest," the policy prohitibts employees from approving reimbursement for their own expenses,

an event in which they participated, or expenses to an individual to whom they directly or indirectly report."  *Id.*  In such a circumstance, "[e]mployees' travel and reimbursement requests are subject to approval at the next highest organizational level."  *Id.*

### c.  *Code of Conduct*

The University's Code of Conduct prohibits self-dealing by prohibiting employees from using their "state positions for personal financial gain beyond [their] official compensation."  *Id.*, pg. 138.  Relatedly, the University Guide to the State Code of Ethics explains: "Employees may not use their official position…for personal financial benefit."  *Id.*

### 2.  The Anonymous Complaint and Subsequent Investigation

On December 14, 2017, Defendant Herbst's office received an anonymous complaint by email with a subject line reading "#metoo and state travel fund issues."[3]  The anonymous sender noted "the recent widespread of #MeToo cases," and encouraged UConn to "look into the appropriateness of its business school OPIM department head traveling together with [his] secretary to academic conferences."  ECF No. 121-11, pgs. 2-4.

The President's Office forwarded the anonymous complaint to Kimberly Fearney, Director of Compliance and Ethics Liaison within the Office of Audit, Compliance and Ethics.  *Id.*  Fearney explained that her "office will have the audit staff review the travel records for the Department Head and staff person."  *Id.*  Fearney crafted a plan to investigate the complaint.  *Id.*  That plan involved "pulling travel records" to identify who

---

[3] Defendants incorrectly state UConn received the complaint December 17, 2017.  ECF No. 121-2, pg. 1.

had gone on certain trips and what kind of trips they were.  *Id.*  Eventually, the scope of the investigation grew to include Sarah Chipman, UConn's Director of Investigations and Deputy Title IX Coordinator, and Defendant Gelston.  *Id.*  On January 2, 2018, Fearney sent a "summary of OPIM travel" purportedly showing that there were nine separate trips between September 2015 and December 2017 where the OPIM Department Head (*i.e.,* the plaintiff) traveled with a "staff person."[4]  *Id.*

The investigation progressed.  Mr. Gelston directed a search of Plaintiff's emails, which uncovered instant messages exchanged between Plaintiff and his subordinate, Melissa Burk (formerly known as Huston, hereinafter "Burk").[5]  ECF No. 145-1 ("*Counterstatement to Defts' Addtl. SOF*"), ¶ 5.  The messages were secured so that they could not be destroyed.  ECF No. 130-1 ("*Counterstatement to Defts' SOF*"), ¶ 7.  On January 16, 2018, Mr. Gelston forwarded an email originally sent by Cyndi Soucy ("Soucy"), UConn School of Business Director of Administration, to Ms. Fearney.  ECF No. 121-11, pg. 252.  That forwarded email reflects that the investigation had broadened into an investigation of prior approvals for additional compensatory time for Burk, and the justifications offered therefor by the plaintiff.  *Id.*

On March 1, 2018, Mr. Gelston informed Dr. Gopal that  the latter was under investigation. ECF No. 141-10, pg. 93-94.  Mr. Gelston wrote that the University "received an anonymous report which raised concerns regarding the business purpose of your travel to several conferences with your administrative assistant, Melissa Burk."  *Id.*  The email continued, "A preliminary review of the matter raised additional concerns regarding Burk's receipt of compensatory time payouts that may have been initiated and/or

---

[4] The attachment to the email was not provided with the parties' exhibits.
[5] The University refers to Burk as having been employed as Plaintiff's administrative assistant.

authorized by you." *Id.* Concluding, Gelston told Plaintiff that "the report raised concerns regarding the possibility of inappropriate conduct/relationship with Burk." *Id.* Gelston explained that the Office of Institutional Equity ("OIE"), specifically Chipman, would investigate Plaintiff's relationship with Burk while OUC separately would investigate the travel and compensatory time matters. *Id.*

On March 2, 2018, Gelston (on behalf of OUC) interviewed Plaintiff in the presence of his union representative, David Amdur ("Amdur"). *Counterstatement to Defts' SOF*, ¶ 10.[6] That same day, Chipman sent Plaintiff a letter formally informing him that OIE would

---

[6] Plaintiff testified that he could not recall anyone from UConn telling him he could not consult an attorney, and he acknowledged that he was represented by his union throughout the investigation process. ECF No. 125-6, Gopal Dep. Tr. 18:8-24. However, his counterstatement to Defendants' SOF ¶ 9 misses the mark in quoting "no relationship" language to suggest, "Plaintiff did not believe Amdur was representing him" (emphasis in original). Indeed, the excerpt from Plaintiff's deposition testimony cited at ECF No. 145 relates to the amorous relationship between Dr. Gopal and Burk, and not to any representation by Amdur:

> Q Okay. Prior to your interview at the Office of Institutional Equity on March 8, 2018, what did you tell David Amdur about your *relationship* with *Burk*?
>
> A. Again, I do not recall what I told him. But I've been very consistent in saying that there was no *relationship* between us.

ECF No. 121-6, Gopal Dep. Tr. 69:6-12 (emphasis added).

This type of misunderstanding (if not misrepresentation) of the record can be found at the very inception of Plaintiff's counterstatement of facts at ECF No. 145. Plaintiff's first paragraph thereof seems to target the second fact listed by Defendants at ECF No. 121-2, regarding the anonymous email sent to UConn on December 17, 2017. Plaintiff represents, "UConn received an anonymous complaint via **_email_** . . . that was copied to State Senator Ziobron, **_which asked_** UConn to investigate…." (emphasis added). In objecting to an assertion which he seems to have invented, Plaintiff argues that the quote "does not state that a state senator asked [UConn] to investigate." In the first instance, the actual quote in question notes that the anonymous email at issue "was copied to State Senator Ziobron. **_That email said,_** …." ECF No. 121-2 at ¶2 (emphasis added). But, under either version of this quoted text, it is clear to the court that Defendants aver the *anonymous email* suggested that UConn should investigate the conduct at issue in this case. *No fair reading* of *either* version suggests that the legislator called for the inquest. In a vacuum, this could be viewed as a collateral inaccuracy unworthy of mention even within a footnote, much less in an asterisk of this length. However, Plaintiff's invention of arguments is a recurrent theme of sending a howl into the night after one's own echo.

Another example appears in the Kennedy deposition at ECF No. 125-5 (73:21–74:19):

> Q (Mr. Brewer): You would agree that there's a lot of policies at the University of Connecticut?
> A (Mr. Kennedy): No, I would not.
> Q: Oh, there's not? So you're familiar with all of them?

be investigating allegations that he maintained an "amorous relationship with an individual whom [Plaintiff] supervise[d]" in violation of the University's "Policy Against Discrimination, Harassment and Related Interpersonal Violence."  ECF No. 121-11, pg. 101; ECF No. 125-6, Gopal Dep. Tr. 220:9-11.

On April 6, 2018, OIE issued its Findings and Recommendations. *Counterstatement to Defts' SOF* ¶ 18; *Counterstatement to Defts' Addtl. SOF*, ¶ 12. Investigators determined that Plaintiff violated the University's Policy Against Discrimination, Harassment and Related Interpersonal Violence, specifically Section X.B (inappropriate amorous relationships between supervisors and subordinate employees). *Counterstatement to Defts' SOF* ¶ 18 (citing Exhibit 16, ECF No. 120-3).  The report quoted instant messages (detailed *infra*, section I.B.3) that evinced an "amorous relationship" between Plaintiff and Burk.  According to OIE, it was not necessary to find that Plaintiff and Burk engaged in any physical activity.  *Id.* ¶¶ 18-21 (citing Exhibit 16, ECF No. 120-3).  That is, in OIE's view, words were enough.[7]  On April 16, 2018, Dean

---

A: It is typical for a university of its size to have this number of policies and offices overseeing policies.

Q: I didn't ask you that, Professor Kennedy.  I said, you would agree there are a lot of policies?

A: Yes.

Q: So you're changing your testimony?

A: No.

Q: There either is a lot of policies or there's not a lot.  Which one is it?

A: I guess I would ask you to restate that question, because it's a relative reference.

Q: It's not relative.  It's a straight up question.  There are a lot of policies at [UConn]?

A: As there are at any major university.

Q: I don't know why you're arguing with me.

A: I'm not.

[7] Plaintiff objected to paragraph 21, but his objections were focused on authorship of the report, not the conclusions drawn therein.

Elliott met with Plaintiff and Amdur to provide them with OIE's final report.  *Id.* ¶ 22; ECF No. 121-4, Amdur Dep. Tr. 157:12-18.

On May 22, 2018, OUC issued its final report.  That report was provided to Plaintiff, Kennedy, and Elliott.  *Counterstatement to Defts' SOF* ¶¶ 24, 25.  OUC's report incorporated OIE's findings and conclusions as well as those of internal auditors (a.k.a. Audit and Management Advisory Services (AMAS)) and attached Plaintiff's and Burk's responses to the OUC Draft Report, for a total of 60 pages.  *Id.*, ¶ 25 (citing ECF No. 121-11, pg. 265 (the draft report)).

### 3. Investigatory Findings

The University's findings concern three separate violation stems: (1) the purported inappropriate amorous relationship with Burk, (2) travel policy violations, and (3) compensatory time violations.  ECF No. 121-11, pgs. 127-144.

#### a. *Relationship Between Dr. Gopal and Burk*

Plaintiff and his subordinate Burk exchanged instant messages evincing a sexual relationship.  The two referred to each other by pet names such as "babe" and "baby." ECF No. 120-5, pg. 7.[8]

On May 2, 2017, Burk sent Dr. Gopal a series of instant messages before going to sleep.  She said, "will dream of u and girls doing naughty things to you and me at the same time."  ECF No. 120-5, pg. 7.  Dr. Gopal responded, "good girl (kiss). sweet dreams <3 hey, that's my fantasy for the night!"  *Id., Counterstatement to Defts' Addtl. SOF*, ¶ 13.

---

[8] The exhibit submitted at ECF No. 120-5 seems to have several pages from different incomplete documents.  The court notes that a seemingly identical report (dated April 6, 2018) was filed at ECF No. 120-3.  While the court quotes from both offerings, it will, where possible, attempt to reference the document that appears to have been transmitted on April 10, 2018.

On June 11, 2017, the two discussed a "retreat night" to take place in Stamford, Connecticut.  Burk desired to "get to the hotel asap" to ensure "it is right for our retreat night."  Plaintiff responded "as soon as possible (kiss)."  ECF No. 120-5, pg. 8.  He commended Burk on her suggestion to "'freshen up'" at the hotel and said she "deserve[s] the best" and "will make sure [she is] happy."  *Id.*  Burk closed the conversation saying she would be taking a shower and going to bed and Plaintiff said "ok babe! [S]end me pics :]" and Burk agreed.  *Id.*

A month later Plaintiff and Burk communicated again via instant message.  This time Burk wished that she could talk to Dr. Gopal before bed.  Plaintiff responded  "[I] will call you baby. [F]am at home but [I] can talk :-)."  *Id.*, pgs. 8-9.  The pair also exchanged the following messages[9]:

> Gopal: you look great baby
> Burk: haha no i dont!
> Gopal: i like your hair baby
> Burk: aww thank you beach hair sex hair haha
> Gopal: i always love the way you look
> Burk: aww that is so sweet of you to say!
> Gopal: i mean it baby :-)
> i want to see that beautiful sex hair when we re in Stamford :]
>
> ***
>
> Burk: aww you will def see that hair soon
> Gopal: yay!
> Burk: you will help me create that hair style in stamford
> Gopal: with pleasure!

---

[9] Plaintiff did not object to the admissibility of the reports (or their contents).  Further, he submitted his own OIE report (ECF No. 125-8) embedded with hearsay statements.  He also submitted an exhibit (ECF No. 126-1) that referenced the OIE report, its conclusions, and to consider his exhibit against his allegations that the University discriminated against him by placing him on administrative leave, it is necessary to review the OIE report.  Thus, the court will consider the OIE report and its contents.

*Id.*, pg. 9.  These messages coincided with overnight trips to Stamford, Connecticut.

*See id.*, pg. 11.  Additional exchanges relied upon by the University in making its

findings included:

> Burk: I want to learn a much as possible from my boss. I will follow any directions
> he gives me with a smile on my face ... no matter how hard the challenge may be
> I am lunch [sic] to learn from such an accomplished smart and strong man.
> Gopal: top to bottom
> Burk: bottom to top!
> Gopal: front and back
> Burk: side to side even if it hurts, I want to push myself to be better for him
> Gopal: you are going to achieve many wonderful things and I am here to help it
> may hurt a bit but the joy will be great
> Burk: I have met the minimum requirements and am ready to exceed your
> preferred (kiss)
>
> \*\*\*
>
> Burk: you liked being able to touch me after so long? i only changed into my skirt
> to show you more
> Gopal: I missed it sooo much!
> Burk: i wasnt too hot i just wanted to do that for you
> Gopal: Touching and smelling you ... aww, heaven!  Aww. You are so sweet
> baby:] lu[10]
> Burk: its almost like we are on our first date again ... ::) you have to woo and say
> me haha WU hah not sure how to spell that word
>
> \*\*\*
>
> [Burk]: i see we got an itinerary[sic] change for trip to Seoul ... doesnt look too
> difft[sic] to me but will compare in the morning at work
> Gopal: OK. Let's talk about it tomorrow. we should start to plan for the trip .
> sightseeing, money exchange, etc.
> Burk: looking forward to it yes def!! cant wait so thankful to go with you! its like im
> princess!
> Gopal: it will be a great trip! will be exotic for both of us :]
> Burk: or queen with her king yes professor! k, talk on whatsapp[11] soon :)
> Gopal: ok :-)
>
> \*\*\*

---

[10] It is unclear, but "lu" might be an abbreviation for "love you."  Plaintiff did not recall what he meant by "lu."
ECF No. 121-6, Gopal Dep. Tr. 111:5-10.
[11] There are references to WhatsApp throughout their instant messages, but their communications made
through WhatsApp are not part of the record in this case.

> Gopal: I wanted to used the camera to capture the white board. I will use it a lot after this week's class thank you :-))))
> Burk: ohh camera only for that use? i can think of some other uses esp in stamford...:)
> Gopal: oh yea:] loved the pics today!!![12]
> Burk: :) good!
> Gopal: really awesome!
> Burk: a little sneak peak
> Gopal: <3

ECF No. 120-3, pgs. 6-8.  Finally, Burk and Dr. Gopal expressed how appreciative they were to have each other:

> Gopal: ... i am lucky ... enjoy working with you and enjoy chatting and spending time with you!
> Burk: I am the lucky one! you are the best thing that has ever happened to me!
> Gopal: Aww! you are a really special per on that I am glad is part of my life:]
> Burk: awww! I couldnt have said it better about you haha
> Gopal: love that we love each other!
> Burk: I love that too! awww, thats so sweet and simple and true ... .I love that we love eacbother that means it all love everything about eachother its so beautiful
> Gopal: :]

*Id.* pgs. 9-10.

The University concluded that Dr. Gopal violated the Policy Against Discrimination, Harassment and Related Interpersonal Violence because he engaged in an undisclosed amorous relationship.  ECF No. 120-3.  The OIE report noted "the definition of 'amorous relationships' in University Policy contains no requirement for in-person or physical interactions" and given "Dr. Gopal's direct supervision of Burk, the intimate, flirtatious and sexual exchanges in the [instant messages] alone are sufficient to constitute a violation by Dr. Gopal of the amorous relationship section of University Policy."  *Id.*, pg. 12.  OIE concluded that there was insufficient evidence to establish that Plaintiff sexually harassed

---

[12] There are references to pictures that were not explained by either party in their briefing.

Burk because it could not establish by a preponderance of the evidence that Plaintiff's conduct was unwelcome.  *Id.*, pg. 13-14.

b.  *Violations of University Travel Policy*

The Plaintiff traveled with Burk on at least four occasions to destinations including Ireland, India, and South Korea to attend "Workshop on Information Technologies and Systems" ("WITS") professional conferences and/or workshops.[13]   ECF No. 126-1; *Counterstatement to Defts' SOF* ¶ 33.  As explained above, UConn's policy prohibited employees from approving expenses for direct subordinates or expenses related to an event in which they participated.  The University's report indicated that "Professor Gopal approved Burk's travel and she approved his;" thus, the report concluded he violated University policy by approving travel expenses for a direct subordinate.  ECF No. 126-1, pg. 3.

The OUC report concluded Plaintiff also violated University policy when he approved Burk's travel for activities in which he was involved, namely the WITS professional conferences.  *Id.*, pgs. 3-5.  Also, the defendants allege Plaintiff further violated the Travel Policy by inviting Burk to these conference without an adequate business justification.

Additionally, Plaintiff's and Burk's travels extended beyond the actual conference dates and the pair had personal expenses reimbursed by the University.  *Id.*, pg. 6.  In sum, Plaintiff and Burk stayed three and four extra days in South Korea and Ireland, respectively.  *Id.*  "Neither Professor Gopal nor Burk were otherwise able to account for their business activities on these additional days."  *Id.*, pg. 7.  Instead, it appeared Burk

---

[13] Plaintiff was President of WITS for a three-year term (2016-2018).  ECF No. 120-6, pg. 2.

(using the pronoun "we") sent an email documenting her activities, traveling to, *inter alia*, tourist destinations, like the Cliffs of Moher "for an all day trip," "St. Patrick's cathedral," "Dublin castle," "shopping on Grafton street," and even "watched [a] Manchester United soccer game with the locals in a pub," before going to "dinner in the castle lounge while Christmas singers sang by the fire." *Id.* The activities did not end there. She described her activities the following days as including "[t]ravel[] from [the] east coast to west coast of Ireland" and added "*we* are trying to make a tee time to play golf tomorrow morning [December 19] then off to another village walking tour in Howth." *Id.* The University reimbursed Plaintiff and Burk for their activities before it came to light that they were of a personal nature. *Id.*

The University concluded that Plaintiff violated the Travel Policy and Code of Conduct. *Id.*, pgs. 10-13.

Dr. Gopal maintains that he "followed all of UCONN Travel Office…rules the same way as other professors and employees." ECF No. 130-11. Rachel Greene ("Greene"), a Fiscal Manager at UConn's School of Business, reviewed requests to travel submitted during the relevant period. ECF No. 125-15, Greene Dep. Tr. 24:3-7; 55:23-56:16. Greene explained that the supervisor-level determines whether the travel is appropriate and her role in the approval process was "fiscal."[14] *Id.*, at 58:7-16. That is, Greene did not evaluate the appropriateness of Plaintiff's complete itinerary before he left.

### c. *Compensatory Time*

"Burk joined the University in February 2013 as a 'Special Payroll employee.'" ECF No. 126-1, pg. 8. Burk assisted OPIM Professor James Marsden ("Marsden") who was

---

[14] There are references in Greene's deposition to documents not included by either party as exhibits to their motions for summary judgment. *See, e.g.,* ECF No. 125-15, Greene Dep. Tr. 60:25-61:11.

the Editor-in-Chief of the Decision Support Systems Journal ("DSS").  ECF No. 125-17, ¶ 4.  The University received certain funds to cover "editorial assistance, office materials, and travel funding."  *Id.* With those funds, Marsden and Soucy hired and paid Burk.  *Id.*, ¶ 10.  At least initially, Burk worked 25-hours per week on a part-time basis.  *Id.*

On or around September 4, 2014, a new full-time position opened within OPIM. That position was a regular, full-time union position.[15]

Burk was hired full-time and was a union member at the University of Connecticut Professional Employees Association ("UCPEA").  ECF No. 125-4, Elliott Dep. Tr. 105:8-12.  "The UCPEA collective bargaining agreement establishes a standard 35-hour work week for UCPEA employees.  Article 18.2 of the UCPEA bargaining agreement allows an UCPEA employee to accrue an hour of compensatory time for each hour worked in excess of a 35-hour work week."  ECF No. 126-1, pg. 13.

Subsequently, Burk approached Marsden and requested to continue working for DSS in addition to her full-time responsibilities.  ECF No. 125-17, ¶ 14.  Marsden did not know if it was possible, but he approached Plaintiff and Cyndi Soucy for input.  *Id.* ¶ 15. Both indicated that it would be possible for Burk to work full-time for the University and part-time for DSS.  *Id.* ¶ 16.  As time progressed, Burk's work for DSS dwindled.  The University's payroll records reflect that Burk's compensatory payments dropped from $1,206.48 per pay-period to $603.24 per pay-period – a reduction from 40 to 20 compensatory time hours.  ECF No.  126-1, pg. 8.

---

[15] The posting was for job title "Administrative Services Assistant IV."

In June 2017, Plaintiff submitted and approved additional compensatory time for Burk.[16] Plaintiff authorized additional compensatory time based on the tremendous increase in the workload at OPIM. *Id.*, pg. 9. Essentially, Plaintiff's request would replace the precise number of hours Burk had lost (*i.e.* her paychecks were increased to $1,206.48). *Id.* Indeed, the University's findings acknowledged the "correlation" between the reduction of Burk's DSS compensatory time and the "identical" increase in her OPIM Department compensatory time. *Id.*, pg. 14. However, this time the justification was different – the need for compensatory time was tethered to OPIM and not DSS. *Id.*, pgs. 8-9.

The University concluded that increase was arbitrary and untethered from the needs of the OPIM Department. *Id.* There was no "nexus" between the approved compensatory time and Burk's actual workload. *Id.* Neither Burk nor Plaintiff kept records reflecting her time worked on OPIM and DSS related tasks and auditors found "[fourteen] instances in which Burk accrued compensatory time on the same date she used vacation or holiday time." *Id.* "[G]iven the lack of documentation supporting the date, time and activities justifying the compensatory time attributed to OPIM Department by Ms. Burk," University auditors concluded "the possibility of time card fraud is high." *Id.*, pg. 15. Burk received more than $90,000 in compensatory time between 2014 and May 2018 and ranked highest of all recipients of such funds within the School of Business. *Id.* at 14.

Additionally, The University found that the arbitrary approval and lack of supervision, in the context of an undisclosed amorous relationship, constituted violations of University policies. *Id.*, pgs. 15-16.

---

[16] Notably, that request was made near the time that Plaintiff and Burk discussed a "retreat night" in Stamford.

4. <u>The Disciplinary Phase (Article 27 Proceedings)</u>

Article 27 of the Collective Bargaining Agreement ("CBA") between the UConn Board of Trustees and the UConn Chapter of American Association of University Professors (AAUP) governs termination of tenured staff. *Counterstatement to Defts' SOF,* ¶ 26. Article 27 permits "discipline and dismissal for tenured or tenure-track faculty" only with "just cause *such as*," *inter alia*, "sexual harassment, serious misconduct, or other conduct which impairs the rights of faculty, students, employees, or others who are engaged with the University in its business or operations." ECF No. 121-11, pg. 46.

The CBA dictates what procedures must be followed before the University terminates a covered employee. At the first step, "[t]he faculty member shall receive in writing a statement from the Dean's office of the reasons for the action being recommended." Second, the covered employee is entitled to a hearing with the Dean.[17] If the employee remains dissatisfied with the Dean's resolution, he can proceed to the second step and appeal to (and have a hearing affront) the University's Provost (i.e., Defendant Kennedy). The Provost must then issue a written decision. At the third and final step, the employee may appeal (with consent of AAUP) the Provost's decision to

---

[17] Plaintiff argues he was denied his right to a fact-finding meeting. *See, generally,* ECF Nos. 125-1, pgs. 18 125-2, ¶ 61; 130-1 pg. 11. As a matter of contractual construction reading a fact-finding requirement into Article 27 does not make sense given that the Dean (here, of the School of Business) must provide a statement of the *reasons* for his recommendation *before* such hearing. The only mention of a "hearing" in the relevant part of Article 27 comes after the Dean's recommendation. At that, the CBA only mentions a "hearing" and does not explicitly require a fact-finding hearing, either on its terms or through past practice. ECF No. 121-11, pgs. 40-41; ECF No. 125-16, Amdur Dep. Tr. 150:18-21; 151:10-21. This remains true even when construing the admissible evidence in a light most favorable to Plaintiff. Plaintiff's citations to Defendant Elliott's and David Amdur's depositions do not support the contention that fact-finding was required; in fact, Elliott testified that he felt a fact-finding meeting *did* take place (but was unnecessary). *See* ECF No. 125-2, Plaintiff's Statement of Facts ("*Plaintiff's SOF*") ¶ 61 (citing Elliott Dep. Tr. 66:1-67:25 ("Q. Did you have a fact-finding hearing for Professor Gopal?  A. Well, it depends on what you call a fact-finding hearing, sir. Q.  No.  It depends on what you call a fact-finding hearing.  Did you have a fact-finding hearing for Professor Gopal?  A.THE WITNESS: Yes.")). Further, Plaintiff had his opportunity to tell his side of the story on March 2, 2018, to Gelston (and at the hearing).  Lastly, Plaintiff does not claim denial of a fact-finding hearing was an adverse employment action; thus, it is immaterial to the parties' motions.

arbitration under the procedures outlines in Article 10 of the CBA. ECF No. 121-11, pgs. 13, 46-47.

The AAUP maintains a grievance committee to evaluate arbitrable cases after the Provost issues a final decision. ECF No. 130-7, Amdur Dep. Tr. 57:13-20. The process of advancing a case to arbitration involves presentations and meetings between a grievant, their union representative, and the grievance committee. *Id.* at 57:21-58:20. After hearing their presentations, the grievance committee decides whether to recommend that the case be brought to arbitration. *Id.* However, the ultimate decision rests with the AAUP's Executive Committee. *Id.*

As detailed above, OIE and OUC completed their investigatory responsibilities by delivering their reports on April 6, 2018, and May 22, 2018, respectively. Those reports contained detailed findings, discussed *infra*, and recommendations. Plaintiff then proceeded to the disciplinary phase whereby University officials reviewed the results of the investigation and determine which, if any, of Plaintiff's infractions warranted discipline under University policies.

On May 29, 2018, in compliance with the first step of Article 27, Dean Elliott informed Plaintiff via letter that the University's School of Business initiated disciplinary procedures. ECF No. 121-11, pg. 149. That May 29th letter noted, "Furthermore, while University policy does not require in-person or physical interaction to establish a prohibited amorous relationship, OIE found by a preponderance of the evidence that the encounters between you and Burk were not limited to banter solely conducted through your messages, and more likely than not included in-person amorous interactions during

overnight travel related to University business." *Counterstatement to Defts' SOF* ¶ 28 (internal quotation marks omitted).

On June 1st, Dean Elliott held an Article 27 hearing, the first step of the disciplinary process, where Plaintiff was represented by the AAUP's Amdur. *Defts' SOF* ¶ 42. Elliott believed the instant messages Plaintiff exchanged with Ms. Burk were indicative of an amorous or physical relationship. *Id.* ¶ 43. He did not find Plaintiff's arguments to the contrary credible. Even if the instant messages reflected mere fantasies or banter, Elliott felt they would have violated the University's policies.[18] *Id.* ¶ 44. Soon thereafter, and in compliance with state law, UConn's Chief Financial Officer notified the State Auditors and Comptroller of the December 2017 and the pending investigations of two UConn employees since that "appears to represent an unauthorized, illegal, irregular or unsafe handling of state funds and resources." ECF No. 120-3. Prior to that Article 27 hearing with Dean Elliott, Amdur had the investigative reports from OIE and OUC for a few weeks to a month; he reviewed them with the Plaintiff.[19] *Defts' SOF* ¶ 34.

On July 26, 2018, Dean Elliott memorialized his recommendation. ECF No. 121-11, pg. 155. He recommended that UConn terminate Plaintiff's employment based on violations of various University policies. He credited the findings in the OIE report and found the Plaintiff and Burk maintained an undisclosed amorous relationship. *Id.* Furthermore, he adopted findings detailed in a Compliance report demonstrating that the plaintiff and Burk violated the University's Travel Policy by seeking reimbursement for

---

[18] Plaintiff claims Elliott confused the "romantic relationship policy" and the policy prohibiting certain amorous relationships, but it appears counsel, not the witness, confused them. ECF 130-8, Elliott Dep. Tr. 80:2-4, 81:25. Further he cites pages in Elliott's transcript that were not provided to the court for review.
[19] Plaintiff's dispute as to this fact is inapposite. While he claims "Amdur spent a 'couple hours'[sic] to prepare for plaintiff's case," that is not what the cited deposition pages state. Amdur spent "a couple hours" preparing *the plaintiff* for the hearing. ECF No. 121-4, Amdur Dep. Tr. 84:8-84:22.

travel lacking a sufficient business purpose and personal in nature. *Id.* He also noted that Plaintiff and Burk were approving each other's travel expenses, a practice that likely would have been prohibited even had they properly disclosed their relationship. Finally, he raised concern with Plaintiff's approval of Burk's compensatory time. While he could not conclude Burk did not actually perform the work for which she was paid, Elliott noted irregularities in the pattern of her payments and found evidence demonstrating a lack of oversight by Plaintiff which was overshadowed by their inappropriate relationship. *Id.*

On July 30, 2018, Plaintiff filed a written appeal with Provost Kennedy challenging Dean Elliott's recommendation. ECF Nos. 121-11, pg. 161; *Counterstatement to Defts' SOF* ¶¶ 78-81. Dr. Gopal submitted a statement to Provost Kennedy denying any physical relationship with Burk and conceding that "[w]hile the communication appears romantic" it did not reflect anything more than "pure banter." ECF No. 126. Plaintiff also characterized these deviations from "**normal** *professional communications* through email and other forms [of communication]" as a small proportion of the whole. *Id.* (emphasis added). Critically, he stated "*[b]eyond **the few instant messages**, I did not violate any university policy.* I explicitly sought permissions, followed all procedures as I was advised and directed, and it was not for any personal gain to me." *Id.*[20]

On August 16, 2018, Plaintiff met with Provost Kennedy. *Counterstatement to Defts' SOF* ¶ 81. That day, Amdur wrote Kelly Bannister ("Bannister"), counsel for the University, and requested that she provide him the courtesy of a "heads up" if Kennedy

---

[20] Plaintiff attempts to create a dispute of fact by claiming he only included the admission based on input from his union representative, David Amdur, that it would help Plaintiff's case. *See Ruiz v. Liberty Mut. Fire Ins. Co.*, No. 19-cv-4399 (VB), 2022 WL 446044, 2022 U.S. Dist. LEXIS 26133, *13-14 (S.D.N.Y. Feb. 14, 2022) (plaintiff cannot create dispute of fact through deposition testimony that contradicts all other evidence in the record). Even if that were the case, Plaintiff chose to include the statement. ECF No. 121-6, Gopal Dep. Tr. 159:1-13. Thus, it is undisputed that he made the statement. Finally, Plaintiff's counsel seem to concede that Plaintiff admitted his instant messages were "stupid." ECF No. 130, pg. 10.

was going to deny Plaintiff's appeal.  ECF No. 141-10, pg. 157; ECF No. 121-4, Amdur

Dep. Tr. 235:5-20.  He added Plaintiff would prefer to resign instead of being terminated.

ECF No. 141-10, pg. 157.  He also requested that Plaintiff's resignation be "ordinary" and

not in "bad standing."  *Id.*  Lest there be any doubt, Plaintiff reiterated that request in an

email to Amdur on August 20, 2018.  *Id.*, pg. 165.

      In the interim, Kennedy spent several hours scrutinizing the reports supporting

Elliott's recommendation that the plaintiff be terminated.   ECF No. 130-5, Kennedy Dep.

Tr. 46:15-47:6.

      Subsequently, Amdur spoke with Bannister in an "off-the-record" conversation.

ECF No. 121-4, Amdur Dep. Tr. 63:18-24.    Such informal conversations were not

atypical; Amdur testified that union and management try to resolve matters through such

conversations.  ECF No. 125-16, Amdur Dep. Tr. 69:20-70:8.  Bannister made it "pretty

obvious" Kennedy would uphold the recommendation that the plaintiff be terminated.  *Id.*

      On August 23, 2018, Burk provided a statement to the University in which she,

among other things, explained that Plaintiff coerced her and the two engaged in sexual

intercourse in Plaintiff's office.  ECF No. 120-4, pgs. 11-19.  She said they engaged in

sexual intercourse one or two times per week.  *Id.*

      Plaintiff resigned on August 29, 2018.  ECF No. 121-11, pgs. 168; 177 (email from

Plaintiff to, *inter alia*, Defendants Kennedy and Elliott with "Subject: Resignation"); ECF

No. 121-4, Amdur Dep. Tr. 168:11-17.  Kennedy accepted Plaintiff's resignation that same

day.  *Counterstatement to Defts' SOF* ¶ 83.  Thus, Plaintiff did not avail himself of rights

under the CBA and pursue arbitration.[21]  ECF No. 121-4, Amdur Dep. Tr. 178:5-19.

---

[21] If he had been terminated, Plaintiff's termination would not be in effect until an arbitration decision were
issued or if there were no appeal to arbitration.  *Id.* ¶ 84.

5. <u>Post Resignation Statements</u>

Around the time Plaintiff resigned his employment, a reporter for the Hartford Courant contacted Defendant Reitz.  ECF No. 130-1, ¶ 92.[22]  Among other things, Reitz shared that the University "was actively moving through the necessary steps toward firing [Plaintiff] when he resigned," that "[Plaintiff's] resignation is listed in university files as reflecting that he left '**not** in good standing,'" (emphasis in original) and a statement which she permitted the reporter to attribute to her.[23]  ECF No. 141-10, pg. 321—330.  Reitz would offer corrections if UConn had mistakenly stated something, but she had no control over what is published and could not compel the media to correct any of their misunderstandings.  *Counterstatement to Defts' SOF* ¶ 93.  Reitz did discover an error in her compensation figures and corrected that."[24] *Id.*

On September 11, 2018, Reitz responded to the Fox 61 reporter's request for information by providing publicly available documents.[25] *Id.* ¶ 103.

Plaintiff subsequently wrote to the Hartford Courant which published his letter about UConn's investigation of his contested travel, but did not address his relationship with his subordinate.  *Id.* ¶ 104.

---

[22] The court notes Plaintiff's objections to the statement, but all parties appear to agree that a reporter contacted Defendant Reitz.
[23] That statement read:

> UConn expects all of its employees to comply with university and state policies. When the university finds that any employee has failed to do so, it takes appropriate action.  The university was in the process of terminating the department head's employment, but he resigned shortly before that process was completed and is no longer employed by UConn.  The audit found that the department head violated existing UConn policies; this misconduct was not due to a lack of applicable policies.

[24] Plaintiff objects to this statement based on Local Rule 56.  That objection is overruled.  Nothing precluded Plaintiff from submitting record evidence, as he did elsewhere, when he stated an objection based on Local Rule 56.
[25] Plaintiff denied this statement without any citation to evidence.

## II.    **DISCUSSION**

For either party to prevail with its motion for summary judgment, the movant must "show[] that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).  Rather, for a party's claim or defense to survive, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

The United States Court of Appeals for the Second Circuit instructs district courts to be cautious of granting summary judgment in employment discrimination cases "where the employer's intent, motivation, or state of mind is [the material fact] at issue." *Milione v. City Univ. of N.Y.*, 950 F. Supp. 2d 704, 709 (S.D.N.Y. 2013).  But at the same time "[t]he court's role is to prevent unlawful [employment] practices, not to act as a superpersonnel department that second guesses employers' business judgments."

*Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002) (cleaned up; internal quotation marks and citation omitted).

### A.  **Plaintiff's Discrimination Claims, Generally**

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's" race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a)(1).  Mr. Gopal alleges UConn violated Title VII by discriminating against him on the basis of his race, color, and national origin. Individuals are not subject to liability under Title VII. *Buon v. Spindler*, 65 F.4th 64, 78 (2d Cir. 2023), *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004).[26]  Thus, he cannot pursue liability against Herbst, Kennedy, Elliott, Gelston, or Reitz pursuant to Title VII.

Plaintiff offers three different theories of liability by which he claims he is entitled to summary judgment: disparate treatment, hostile workplace, and disparate impact.[27] Defendants argue he cannot prevail, and, in fact, the court must enter summary judgment against him because he neither alleged an adverse employment action nor suffered a hostile work environment.

---

[26] Mr. Gopal agrees.  He previously noted "[t]here is no Title VII claim in the complaint against any individual defendant." ECF No. 33, pg.11 (citing Compl. ¶ 80) . Further, the Complaint is clear: "UCONN [sic] actions and termination of plaintiff violated Title VII."  *Id.*

[27] Disparate treatment and hostile workplace claims are distinct with separate elements and defenses. *Parra v. City of White Plains*, 48 F. Supp. 3d 542, 553 (S.D.N.Y. 2014) (alterations omitted) (citing *Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001)).  Undoubtedly, hostile workplace can be referred to as a form of disparate treatment, but the court will discuss them separately while keeping in mind certain facts might inform its analysis under both theories.  *Dauer v. Verizon Communs. Inc.*, No. 03-cv-5047 (PGG), 2009 U.S. Dist. LEXIS 5182, *7 (S.D.N.Y. Jan 26, 2009).  Further, while there is ample discussion of pattern-or-practice claims in each party's brief, little if any attention is paid to Plaintiff's assertion that UConn's policies had a disparate impact on the plaintiff.

### B.  Disparate Treatment

Title VII's disparate treatment provision prohibits UConn and its agents from "discharg[ing] any individual, or otherwise [] discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's…race, color, [or] national origin." 42 U.S.C. § 2000e-2(a)(1).  Disparate Treatment is "the most obvious evil" that Congress had in mind when it enacted Title VII and "the most easily understood." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (internal citations omitted); *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977).

Plaintiff may, but is not compelled, to use the *McDonnell Douglas* framework (*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)) in an action alleging disparate treatment under Title VII. *See Legg v. Ulster Cnty.*, 820 F.3d 67, 72 (2d Cir. 2016); *see also McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004).  Plaintiff may prove disparate treatment in violation of Title VII through (1) direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic, *or* (2) circumstantially by using the burden-shifting framework set forth in *McDonnell Douglas*.  *Labarbera v. NYU Winthrop Hosp.*, 527 F. Supp. 3d 275, 290 (E.D.N.Y. 2021) (citing *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 212-213 (2015)).

Direct evidence exists when "an impermissible criterion was in fact a 'motivating' or 'substantial' factor in the employment decision." *De la Cruz v. N.Y. City Human Res. Admin. Dep't*, 82 F.3d 16, 23 (2d Cir. 1996) (emphasis in original) (citations omitted). Direct evidence can be shown by "a workplace policy or decision [that] relies expressly on a protected characteristic" or through "conduct or statements by [someone] involved

in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude." *Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir. 1992).

But plaintiffs are generally incapable of discovering direct evidence of discrimination. Assuredly, such evidence is "rarely admitted," *Mhany Mgmt. v. Cnty. of Nassau*, 819 F.3d 581, 610 (2d Cir. 2016), and "[a]n employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to a discriminatory intent." *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991) (citations omitted). "Because it is often difficult to obtain direct evidence of discriminatory intent, we employ a burden-shifting framework," that is, the *McDonnell Douglas* burden-shifting framework, to "progressively sharpen[ ] the inquiry into the elusive factual question of intentional discrimination." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)).

## C. Plaintiff's *Prima Facie* Case

In *McDonnell Douglas* the Supreme Court of the United States allocated the burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment. The plaintiff's first objective is to state a *prima facie* case of discrimination. Stating a *prima facie* case requires Mr. Gopal to show that (1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *Milione*, 950 F. Supp. 2d 710 (citing *McDonnell Douglas*, 411 U.S. 802). The burden of establishing a *prima facie* case of disparate treatment is not onerous. *Texas Dept. of Community Affairs* v. *Burdine*, 450 U.S. 248, 253

(1981); *see Kelleher v. Fred A. Cook, Inc.*, 939 F.3d 465, 468 (2d Cir. 2019) ("[A] plaintiff's burden to establish an initial *prima facie* case is, by design, minimal and *de minimis*."), *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 401(2d Cir. 1998) (same).

After the plaintiff states a *prima facie* case of discrimination, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  *Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1045 (2d Cir. 1992).  "This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (internal quotation marks omitted).  "If the defendant can meet this burden with sufficient specificity, the onus returns to the plaintiff, who ultimately must establish by a preponderance of the evidence that the nondiscriminatory reasons proffered by the defendant are a pretext for discrimination."  *Song*, 957 F.2d 1045 (citations omitted).

The United States Court of Appeals for the Second Circuit recently elaborated on and clarified its position on the third step of the *McDonnell Douglas* framework, "which has admittedly not always been articulated in [its] case law with the utmost clarity."  *Bart v. Golub Corp.*, 96 F.4th 566, 575 (2d Cir. 2024).  The court held that "[t]o survive summary judgment on a Title VII disparate treatment claim, a plaintiff may, but need not, show at the third stage of the *McDonnell Douglas* burden-shifting test that the employer's stated justification for its adverse action was nothing but a pretext for discrimination; a plaintiff may alternatively satisfy this burden by adducing evidence that, even if the employer had mixed motives, the plaintiff's membership in a protected class was at least one motivating factor in the employer's adverse action.  *Bart*, 96 F.4th 578.

Evidence of *motive* is critical.  "In a discrimination case, . . . . [the court is] decidedly not interested in the truth of the allegations against plaintiff."  Rather, the court's focus is "what 'motivated the employer' . . . ." *Howell v. Montefiore Med. Ctr.*, 675 Fed. Appx. 74, 75 (2d Cir. 2017) (citing *McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006)) (emphasis omitted) (quoting *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983))).

Defendants do not contest the first two elements of Plaintiff's *prima facie* case.  Indeed, they agree Plaintiff belonged to a protected class.  Also, Defendants concede Plaintiff was qualified for his position.  But they dispute that he suffered an adverse employment argument, contending that "Plaintiff did not suffer an adverse employment action because he voluntarily resigned."  ECF No. 120-1, pg. 17.  They add Plaintiff also has "failed to make even a minimal showing of circumstances that could give rise to an inference of discrimination based on membership in a protected class."  *Id.*, pg. 15.

### 1. Adverse Employment Action

Title VII makes it unlawful for an employer to "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... race, color, or national origin." § 2000e–2(a)(1).  The applicable statutory language thus prohibits "discriminat[ing] against" an individual "with respect to" the "terms [or] conditions" of employment because of that individual's race, color, or national origin.  "[T]erms [or] conditions" is not strictly limited to harms in a "contractual sense" and covers more than the "economic or tangible."  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57,

28

64 (1986).  Instead, Title VII aims to root out the "entire spectrum" of discrimination in the workplace.  *Id.*

Mr. Gopal's complaint (ECF No. 1) and briefing takes a scattershot approach by alleging several different adverse employment actions.[28]  Indeed, Mr. Gopal's complaint alleges eight different adverse employment actions, and his briefing conflates the treatment of comparator evidence and what is necessary to demonstrate an adverse employment action.  *See* ECF No. 130, pgs. 14-15.  He also conflates claims alleging discrimination with those alleging retaliation.  *See id.*, pg. 19 (providing examples of "*retaliatory* conduct"); *see also Williams v. PMA Cos.*, 564 F. Supp. 3d 32 (N.D.N.Y. 2021).[29]  Discrimination and retaliation are distinct claims and what may constitute an adverse employment action for a claim of discrimination may not be an adverse employment action for a claim of retaliation.  *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 357-58 (2024) (differentiating Title VII discrimination claims from retaliation claims by citing *Burlington Northern & Santa Fe Railway Co. v. White* 548 U.S. 53 (2006) and refraining from applying the siginificant harm requirement).  Of course, this inures to the plaintiff's benefit as he does not need to meet a more onerous demand that the adverse employment action be "significant," "materially adverse" or otherwise. *Muldrow*, 601 U.S. 346, 348

---

[28] For example, in his complaint he describes the following alleged adverse employment actions: " (1) Plaintiff was subjected to a hostile work environment from March 2018 to August 29, 2018, the time he left UCONN; (2) Plaintiff was threatened with criminal prosecution if he did not resign; (3) Plaintiff was denied the opportunity of proper union representation during a rushed termination process; (4) Plaintiff was forced to resign on August 29, 2018, two days before he would have received a full pension for 25 years of employment; (5) Plaintiff's resignation was, without any legitimate basis, characterized as in[sic] 'not in good standing;' (6) non-payment for extra class teaching totaling approximately $15,000; (7) lost wages, health and pension time and benefits, and (8) emotional distress damages. " *See* ECF No. 1, ¶ 54.  It goes without saying, emotional distress damages are not an adverse employment action.

[29] Plaintiff cites the *Zelnik v. Fashion Inst. of Tech.*, which dealt with an employee alleging *retaliation* in violation of his First Amendment rights.  464 F.3d 217, 225 (2d Cir. 2006)

29

The plaintiff does not have to show is that the harm incurred was significant or otherwise exceeded some heightened bar. *Muldrow*, 601 U.S. 350.[30] Instead, Mr. Gopal need only allege "*some* harm respecting an identifiable term or condition of employment," but that harm need not be "significant . . . [o]r serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Id.* at 347; *see id.* at 980 (providing illustrative examples of what constitutes "some harm," including a loss in "money, time, satisfaction, schedule, convenience, commuting costs or time, prestige, status, career prospects, interest level, perks, professional relationships, networking opportunities, effects on family obligations, or the like") (Kavanaugh, J., concurring).

Plaintiff's summary judgment briefing narrows in focus and proffers two adverse employment actions: (1) UConn placing him on administrative leave, and (2) constructive discharge.[31]  As discussed above, an adverse employment action alters the terms and conditions of employment; that is, Mr. Gopal needs to show an action to his detriment – termination, demotion, transfer, etc.[32]  So long as it is sufficiently supported, constructive

---

[30] When Defendants' motions for summary judgment were initially filed, courts in this Circuit held that to allege an adverse employment action, a plaintiff was required to have endured some *materially significant disadvantage* with respect to the terms of the plaintiff's employment.  *Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir. 1997) (to show an adverse employment action employee must demonstrate "a materially adverse change in the terms and conditions of employment") (quoting *McKenney v. New York City Off-Track Betting Corp.*, 903 F. Supp. 619, 623 (S.D.N.Y. 1995)).

[31] Plaintiff also raises being investigated for months and being threatened with termination, but these appear linked, and not independent of, being placed on administrative leave and constructive discharge.  In any event, Plaintiff does not offer any authority for the proposition that less than six months of investigations (and hearings he initiated challenging the findings of the same) constitutes an adverse employment action.  Nor does he explain how the threat of termination (that Kennedy and Elliott *never made*) can be construed as an adverse employment action.  The court also notes that, throughout his briefing for and against summary judgment, Plaintiff is inconsistent in what he is alleging to be an adverse employment action.

[32] Indeed, Plaintiff cited the *Zelnick* case which detailed illustrative examples of adverse employment actions, like negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities."

discharge can independently satisfy the third element of the *McDonnell Douglas* test. *Green v. Brennan*, 578 U.S. 547, 555 (2016), *Green v. Town of East Haven*, 952 F.3d 394, 404 (2d Cir. 2020) (properly pled constructive discharge satisfies third element requiring adverse employment action). Plaintiff does not argue that the Universirty's decision to classify his resignation as one in "bad standing" constitutes a separate adverse employment action. *See, e.g.,* ECF No. 125-1, pg. 7 (omitting any mention of the "bad standing" moniker from his list of "tangible employment actions").

### a. *Administrative Leave*

The United States Court of Appeals for the Second Circuit previously decided whether placing an employee on administrative leave constituted an adverse employment action. In *Joseph v. Leavitt*, the plaintiff argued that he suffered an adverse employment action when he was placed on administrative leave (with pay pending the results of a criminal matter) for approximately five months thereafter. 465 F.3d 87, 91 (2d Cir. 2006). The Second Circuit held that administrative leave with pay during the pendency of an investigation does not, without more, constitute an adverse employment action, and it went on to explain that four other circuit courts -- the Fourth, Fifth, Sixth, and Eighth -- had done the same. *Id.* at 90-91; *see also Perez-Dickson v. Bridgeport Bd. of Educ.*, 860 Fed. Appx. 753, 756 (2d Cir. 2017) (citing *Leavitt*); *accord Singletary v. Missouri Dept. of Corrections*, 423 F.3d 886, 889 (8th Cir. 2005) (89-day suspension pending investigation), *Peltier v. United States*, 388 F.3d 984, 986 (6th Cir. 2004) (administrative leave pending internal investigation and grand jury proceedings); *Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001) (holding that "placing [an employee] on administrative leave with pay for a short time to allow investigation" is not an adverse

action for retaliation purposes), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 60 (2006), Merrick T. Rossein, 1 *Employment Discrimination Law and Litigation*, § 2:6. Adverse employment action (2024).

But the Second Circuit cautioned courts against finding that placing an employee on administrative leave could never constitute an adverse employment action. Instead, it focused the lower district courts on the "relevant question": whether the defendant merely "applied reasonable disciplinary procedures to [the plaintiff] or if the[y] exceeded those procedures and thereby changed the terms and conditions of employment." *Leavitt*, 465 F.3d at 92 n.1.

This court must confront the tension between *Muldrow* and *Leavitt*. The *Leavitt* decision rested on finding that the plaintiff endured a "materially adverse change in the terms and conditions of employment." *Id.* at 90. But the Supreme Court's opinion in *Muldrow* specifically rejected that standard. *Muldrow*, 601 U.S. 357-358 (explaining that incorporating the "materially adverse" standard to discrimination cases would result in a "mismatch" because the more stringent retaliation standard "was meant to capture those (and only those) employer actions serious enough to dissuade[ ] a reasonable worker from making or supporting a charge of discrimination"). To date, the Second Circuit has not had occasion to interpret its prior holdings considering *Muldrow*.

The question is whether requiring an employee to take administrative leave ultimately places them in a worse position. At least one post-*Muldrow* opinion takes the position that suspension with pay, without more, does not rise to the level of an adverse

employment action.[33] *Carter v. Eureka Multifamily Grp.*, No. 22-cv-1429 (CCW), 2024 WL 2816135, 2024 U.S. Dist. LEXIS 97814, *16-17 (W.D. Pa. June 3, 2024).  Other courts are less sure.  *Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868 (6th Cir. 2024) ("one might reasonably argue that a temporary suspension (even with pay) causes some harm and also concerns a term or condition of the job—all that *Muldrow* now requires under Title VII.") (cleaned up); *Russo v. Bryn Mawr Trust Co.*, 2024 U.S. App. LEXIS 20055, *8 n.3 ("suspension with pay might, under some circumstances, constitute an adverse employment action"); *Stewart v. United States Dep't of Agriculture*, No. 23-cv-1194 (TSC), 2024 U.S. Dist. LEXIS 175314, *16 (D.D.C. Sept. 27, 2024) (holding involuntary administrative leave is a "textbook" example of an adverse employment action); *Stepien v. Raimondo*, 2024 WL 4043589, 2024 U.S. Dist. LEXIS 158963, *43 (W.D. Wash. Sept. 4, 2024) (finding administrative leave may constitute an adverse employment action because the plaintiff could not be on premises, contact colleagues, or perform most of her work), *Smith v. Crittenden Cnty.*,  No. 22-cv-42 (LPR), 2024 WL 2194847, 2024 U.S. Dist. LEXIS 87518, *25 n.178 (E.D. Ark. May 15, 2024) (noting *Muldrow* likely overruled Eight Circuit cases finding suspension with pay is not an adverse action).

Still, at least on the present record, the court cannot find that placing an employee on administrative leave amounts to an adverse employment action.[34]  The court readily concedes that, particularly as to public service employment (whether as an educator, a

---

[33] The court does not believe there is a material distinction between administrative leave and suspension. *See, e.g., Scott v. Metropolitan Health Corp.*, 234 Fed. Appx.  341, 348 (6th Cir. 2007) (referring to a paid leave as "a suspension with pay and full benefits"), *Richardson v. Petasis*, 160 F. Supp. 3d 88, 106 (D.D.C. 2015) (evaluating discrimination claim under Title VII framework and explaining that plaintiff was placed "on 'paid administrative leave' (which can also be appropriately referred to as a suspension)").  The plaintiff seems to agree as well.  *See* ECF No. 130; pgs. 6, 14, 17, 21-22, 30.
[34] Plaintiff appears to abandon his claim that being placed administrative leave constitutes an adverse employment action in his opposition to Defendants' motion for summary judgment.  Instead, that brief focuses on constructive discharge.  The court considered it anyway.

law enforcement officer, a town clerk, or a judge) work is more than a salary or wage. Beyond income it provides personal fulfillment, professional identity, and human dignity. Justice Douglas observed "[t]he right to work" is "the most precious liberty that man possesses." *Barsky v. Board of Regents*, 347 U.S. 442, 472 (1954) (Douglas, J, dissenting).  Myopically viewing employment solely through an economic lens ignores the possibility that employers can subject employees to "some harm" in ways not adequately reflected in a pay stub.  This is precisely what can inspire employees to resign in protest over changes in policy or procedure, or limits to the service they provide.  And decisions that tend to negatively impact an employee's "prestige" or "status" reasonably might harm them, as well, particularly now that it is no longer necessary to show substantial or material harm.  *See Muldrow*, at 980 (Kavanaugh, J., concurring).

While establishing an adverse employment action is merely part of a *threshold* inquiry which is neither demanding nor onerous, *see Burdine*, 450 U.S. 248, 253, Plaintiff did not plead or argue that his colleagues knew he was placed on administrative leave, or that he was prohibited from teaching classes.  And even though *Muldrow* was decided after Plaintiff submitted his briefing, binding jurisprudence still seems to permit placing an employee on paid administrative leave pending an investigation such as this one, thus allowing employers to take responsible steps (particularly in the case of a university and a public sector employer) to protect against any ongoing misconduct by the employee under investigation without rendering such employee any "worse off."

Dr. Gopal was not subjected to the type of consequences imposed upon the *Muldrow* plaintiff, who went from being a plainclothes FBI Task Force Officer with an unmarked take-home police vehicle and FBI credentials to being forced back into a

34

uniformed position with unpredictable shifts (which included weekends) and decreased responsibilities, over her objection, and without being under investigation for impropriety. But he did argue that Defendants violated their own policies (or created one for him) by attaching the "bad standing" moniker to his resignation.  It appears undisputed that the plaintiff was the first to receive this moniker and that the University did not maintain a policy upon which to base its decision to apply that moniker to Plaintiff's resignation.  *See Leavitt*, 465 F.3d at 92 n.1. (the "relevant question" is whether the defendant merely "applied reasonable disciplinary procedures to [the plaintiff] or if the[y] exceeded those procedures and thereby changed the terms and conditions of employment.").

 For the purposes of its analysis, the court will presume without deciding that Plaintiff established an adverse employment action and thus will continue its evaluation of Plaintiff's *prima* facie case.

### b.  *Constructive Discharge*

"The constructive discharge concept originated in the labor-law field in the 1930's; the National Labor Relations Board (NLRB) developed the doctrine to address situations in which employers coerced employees to resign, often by creating intolerable working conditions, in retaliation for employees' engagement in collective activities." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141-142 (2004) (citations omitted).  The doctrine was "solidly" established by the time Congress passed Title VII. *Id.*

To establish constructive discharge, Dr. Gopal must show that the abusive working environment became so objectively intolerable that his resignation qualified as a fitting response. *Id.*, *Green v. Town of East Haven*, 952 F.3d 407 (articulating standard as "whether in light of the evidence as a whole as to intolerable working circumstances, a reasonable person in the employee's shoes would have felt compelled to resign.")

(citations and internal quotation marks omitted).  "When the employee resigns in the face of such circumstances, Title VII treats that resignation as tantamount to an actual discharge." *Green v. Brennan*, 578 U.S. 547, 555.  Further, "a plaintiff must show deliberate action on the part of the employer."  *Mack v. Otis Elevator Co.*, 326 F.3d 116, 128 (2d Cir. 2003), *abrogated on other groundsby Vance v. Ball State Univ.*, 570 U.S. 421 (2013) (citation and internal quotation marks omitted); *see Gonzalez v. City of New York*, 845 Fed. Appx. 11, 19 (2d Cir. 2021) ("Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily"); *Whitright v. Hartford Pub. Schs*, 547 F. Supp. 2d 171, 180 (D. Conn. 2008) ("[I]f a plaintiff suing for constructive discharge cannot show specific intent, he or she must at least demonstrate that the employer's actions were deliberate and not merely negligent or ineffective.").

"The standard for constructive discharge is a demanding one because it 'cannot be proven merely by evidence that an employee . . . preferred not to continue working for that employer . . . [or that] the employee's working conditions were difficult or unpleasant.'"  *Madray v. Long Island Univ.*, 789 F. Supp. 2d 403, 409-410 (E.D.N.Y. 2011) (quoting *Spence v. Maryland Case Co.*, 995 F.2d 1147, 1156 (2d Cir. 2003)). Determining whether a work environment becomes so intolerable that an objective person would feel compelled to resign is fact-intensive and not always amenable to resolution at the summary judgment stage.  *Green v. Town of E. Haven*, 952 F.3d 405 ("The fact that this substantive standard is an objective one, however, does not necessarily mean that

what a reasonable person in the plaintiff's shoes would have felt compelled to do is determinable as a matter of law, for an objective question is often fact-specific.").

"Conducting an investigation into an employee's alleged misconduct does not give rise to a work environment so hostile as to warrant an inference of constructive discharge." *Boylan v. Arruda*, 42 F. Supp. 2d 352, 357 (S.D.N.Y. 1999) (citing *Martin v. Citibank N.A.*, 762 F.2d 212, 221 (2d Cir. 1985)); *see Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 73-74 (2d Cir. 2000) (no constructive discharge where internal investigator trivialized plaintiffs' concerns because "ineffective or even incompetent" investigations do not, absent more, "rise to the level of deliberate action required" for constructive discharge); *accord Dickman v. Univ. of Conn. Health Ctr.*, No. 08-cv-588 (VLB), 2013 U.S. Dist. LEXIS 190849, *29-31 (D. Conn. Aug. 29, 2013) (collecting cases).

But a plaintiff may proceed on a constructive discharge claim if they resign after their employer intimates that they are likely to be fired. *Green v. Town of East Haven*, 952 F.3d 409 (plaintiff's constructive discharge and ADEA claim survives where she presented evidence that she would likely be terminated after disciplinary hearing). Threats of termination do not need to be "a categorical ultimatum," or delivered by an ultimate decisionmaker. *Id.* at 406.

The facts of this case are materially distinguishable from Plaintiff's cited authority. As he correctly noted, it is undisputed that UConn's agents told Amdur, Plaintiff's union representative, that he would be terminated. Critically, though, Plaintiff requested a "heads up" through his representative. That is, Plaintiff himself *requested* the very communication he now calls a "threat." On August 16, 2018, Amdur wrote Bannister and

asked that she provide him the courtesy of a "heads up" if Kennedy was going to deny Plaintiff's appeal.  *See* ECF No. 141-10, pg. 157; Amdur Dep. Tr. 235:5-20.  He added Plaintiff would prefer to resign instead of being terminated.  *See* ECF No. 141-10, pg. 157.  This important context undercuts any notion that the communication was intended to be, or that it reasonably construed as a "threat" of termination.  Plaintiff cannot create a constructive discharge claim by requesting a courtesy and ultimately having it granted any more than he can invent facts or arguments as highlighted at the start of this ruling.

The plaintiff has not adequately supported his claim that he was constructively discharged, and the court will not consider it any further.

## 2. Discriminatory Intent

As previously explained, the court presumes Plaintiff established an adverse employment action – administrative leave.  Thus, the court proceeds to the fourth prong of Plaintiff's *prima facie* case, which is the requirement that there be some evidence of discriminatory intent as applied to UConn's decision to place Plaintiff on administrative leave.

Evidence of discriminatory intent can come in many forms.  A plaintiff may, for example, rely on facts showing "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group, or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge."  *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015).  Any comparator must be "similar situated; that is, bear reasonably close resemblance to Plaintiff's case, including acts of comparable seriousness."  *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000).

38

"The determination that two acts are of comparable seriousness requires . . . an examination of the context and surrounding circumstances in which those acts are evaluated." *Id.*

The plaintiff has not alleged the defendants referred to his performance in ethnically degrading terms. Nor has he alleged invidious comments about others in his protected group. In fact, it appears the University replaced Plaintiff with a member of one of the protected classes that serves as the basis of his *prima facie* case. ECF No. 121-1, pgs. 15-16. Instead, the crux of Plaintiffs' argument is that the University treated similarly situated members of different protected groups differently. In this case, the court cannot find that Plaintiff satisfied the threshold inquiry due to his failure to plead sufficient facts demonstrating discriminatory intent, but it will proceed with its analysis as if Plaintiff had established a *prima facie* case.

### D. Legitimate Non-Discriminatory Reason

To satisfy its burden of production, the University must articulate its "clear and specific" nondiscriminatory reason for placing the plaintiff on administrative leave "through the introduction of admissible evidence." *Fu v. Consol. Edison Co. of N.Y., Inc.*, 855 Fed. Appx. 787, 790 (2d Cir. 2021) (quoting *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 132 (2d Cir. 2012)).

Defendants offered several nondiscriminatory reasons for placing Plaintiff on administrative leave. Defendants cited Plaintiff's violation of the "romantic/sexual relationship policy," "his admitted inappropriate communications with his subordinate via UConn email," and his violation of other policies." ECF No. 121-16.

E. **Pretext**

"To survive summary judgment on a Title VII disparate treatment claim, a plaintiff may, but need not, show at the third stage of the McDonnell Douglas burden-shifting test that the employer's stated justification for its adverse action was nothing but a pretext for discrimination; a plaintiff may alternatively satisfy this burden by adducing evidence that, even if the employer had mixed motives, the plaintiff's membership in a protected class was at least one motivating factor in the employer's adverse action." *Golub Corp.*, 96 F.4th 578. Relevant here, a plaintiff may demonstrate pretext by showing that similarly situated employees outside the protected class received more favorable treatment.

1. Comparators

An employee is similarly situated to co-employees if they were (1) "subject to the same performance evaluation and discipline standards" and (2) "engaged in comparable conduct." *Graham*, 230 F.3d 40. "[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Id.* In other words, the comparator must be similarly situated to the plaintiff "in all material respects." *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997).

a. *James Marsden, Cyndi Soucy, Glen Herzewski, and Rachel Greene*

Plaintiff's "key comparator" is James Marsden ("Marsden"), a white male employed by the University from August 1993 to January 2020. Plaintiff offers his declaration as proof that, together with Ms. Soucy, Marsden approved Burk's compensatory time.

But what happened in 2016 is beside the point.  There is no allegation in this case that Marsden maintained an amorous relationship with anyone for whom he requested additional compensatory time.  Nor is there any fact casting doubt as to his decision to request that Burk be paid compensatory time for her duties related to OPIM or DSS.  Here, the focus is on Plaintiff's alleged relationship with Burk, with whom he was discussing a "retreat night" to Stamford with sexually suggestive language around the time he requested that she be paid additional monies for unsubstantiated and undocumented work.  Marsden simply is not a similarly situated comparator.  *See Ruiz v. Cty. of Rockland*, 609 F.3d 495 ("[That Plaintiff was] accused by multiple patients and co-workers of inappropriate and unlawful behavior clearly distinguishes [Plaintiff] from other employees who were not the subject of such accusations.").  Nor are Cyndi Soucy, Glen Herzewski, and Rachel Greene.  There was no allegation that Soucy, Herzewski,[35] or Greene engaged in their own, or knew about Plaintiff's, inappropriate relationship, that the plaintiff would be allegedly pilfering money from state coffers to funds excursions coinciding with otherwise seemingly legitimate business trips, or that Burk's compensable time would be increased around the time Plaintiff and Burk planned a "retreat night" in Stamford.  Furthermore, Plaintiff was a Professor and Department Head whereas Soucy, Herzewski, and Greene occupied administrative roles.

b. *Joseph Reynolds*

Joseph Reynolds was an adjunct faculty member in the University's Department of English.  ECF No. 125-8, pg. 1.  On August 28, 2017, a UConn student, who had been

---

[35] Glen Herzewski was not mentioned in Plaintiff's Memorandum in Support of Motion for Summary Judgment (ECF No. 125-1) or his Statement of Facts (ECF No. 125-2).  Plaintiff only offers him as a comparator in opposition.  Therefore, the court's analysis of whether Herzewski is a similarly situated comparator is limited to Defendants' Motion for Summary Judgment.

enrolled in one of Professor Reynolds' Spring 2017 courses, responded to an OIE inquiry and indicated that she had exchanged emails with Professor Reynolds that she felt she needed to report due to the content of the messages. *Id.*, pg. 3. After an investigation, OIE issued a Notice of Investigation to Professor Reynolds, who was placed on administrative leave. *Id.*, pg. 6; ECF No. 125-2, ¶ 55. Shortly thereafter, Professor Reynolds resigned before any formal hearing took place.

Put simply, the University imposed the same sanction on Joseph Reynolds as the plaintiff's alleged adverse employment action. Both were put on administrative leave after investigation. As explained above, Plaintiff *does not* argue that the University applying the "bad standing" moniker in and of itself constituted an adverse employment action. But even if it did, the plaintiff was disciplined for more than inappropriate sexual relationships. Indeed, he was also accused of travel policy and compensatory time violations, and Plaintiff's case went through formal fact finding and resulted in a final determination. That is, he is accused of a greater range of misconduct than Reynolds, who was an adjunct professor in a different department, and Plaintiff argued the University's allegations to a final determination.

The court's focus is "what 'motivated the employer' . . . ." *Howell*, 675 Fed. Appx. 74, 75 (citing *McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006)) (emphasis omitted) (quoting *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983))). The plaintiff failed to establish a similarly situated comparator.[36] Based on the *undisputed facts*, in the light most favorable to the nonmovant, it seems evident that what motivated the University were the violations

---

[36] Plaintiff's other comparators, including Hall of Fame basketball coach Jim Calhoun, plainly are not similarly situated and must be dismissed as mere "March madness."

Plaintiff is alleged to have committed.  The University was free to accept Burk's statement that Plaintiff pursued her and engaged in sexual relations with her to be true, especially considering the text messages the two exchanged.  Critically, the plaintiff appears to have admitted wrongdoing.  ECF No. 120-6 ("Reflecting upon it, I now realize that I was stupid to have engaged in these conversations.").

Based on what was argued in the parties' briefing, Defendants' summary judgment is granted on Plaintiff's Title VII disparate treatment claim.[37]

### F.  Hostile Work Environment

The crux of Plaintiff's hostile workplace claim is that he was subjected to discriminatory intimidation that materially altered his employment conditions when "from March 2018 to August 29, 2018 when he was notified of the investigations until his resignation and was denied the opportunity of proper union representation during the termination process."[38]   ECF No. 125-1, Pg. 18.   While Plaintiff's argument is not altogether clear, he also appears to argue that collusion between the University and AAUP supports his hostile workplace claim.  As a preliminary matter, placing an employee on administrative leave, with pay, pending investigation does not in and of itself constitute a hostile workplace claim. *See Boylan v. Arruda*, 42 F. Supp. 2d 352, 353 (S.D.N.Y. 1999); *see also Farzinpour v. Berklee Coll. of Music,* 616 F. Supp. 3d 98, 115 (D. Mass. 2022) ("Even allegedly 'baseless, improper, and biased investigation[s]' do not necessarily 'constitute the frequent, severe, physically threatening or psychologically humiliating activity necessary to sustain a hostile work environment claim.'" (quoting *Norloff v.*

---

[37] This includes Plaintiff's disparate impact claim, which was only briefly mentioned and not otherwise addressed.

[38] In Plaintiff's Complaint, he refers to the termination process as "rushed."  ECF No. 1, ¶ 54.

*Virginia*, 173 F.3d 424 (4th Cir. 1999)); *Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 121 (D.D.C. 2004). But even if the court were to put that aside, nothing in Plaintiff's brief (that has not already been disposed of elsewhere) suggests the decision to put Plaintiff on administrative leave and subject him to investigation was driven by his membership in a protected class.

### 1. UConn-AAUP Collusion

Plaintiff argues throughout his briefing that Amdur, AAUP, and Defendants colluded to deprive Plaintiff of his rights under the CBA. To be sure, in a Railway Labor Act context, the Second Circuit has suggested that "collusion" between a union and employer in a union's breach of the duty of fair representation may give rise to liability on the employer's part for that breach. However, it has never identified what conduct would amount to "collusion," or held an employer liable on this basis. *See Desrosiers v. Am. Cyanamid Co.,* 377 F.2d 864, 870-871 (2d Cir. 1967); *see also Flight Attendants in Reunion v. Am. Airlines, Inc.*, 813 F.3d 468, 475 (2d Cir. 2016) (citing *United Indep. Flight Officers, Inc. v. United Air Lines, Inc.*, 756 F.2d 1274, 1283 (7th Cir. 1985)); *but see Beckington v. Am. Airlines, Inc.*, 926 F.3d 595, 603-610 (9th Cir. 2019) (holding in Railway Labor Act context that "collusion" cannot be the basis for an employer's liability in the union's breach of its duty of fair representation). Perhaps aware that his claims could not withstand a motion to dismiss, Plaintiff did not allege a duty of fair representation claim in his Complaint.[39] ECF No. 1. *See Caldarera v. Int'l Longshoremen's Ass'n, Local 1*, 765 Fed. Appx. 483, 487 (2d Cir. 2019) (affirming dismissal of plaintiff's "skeletal" duty of fair representation

---

[39] Plaintiff did not allege a duty of fair representation claim in his complaint based on federal law, state law, tort, or otherwise.

claim because his conclusory allegations that the union colluded with his former employer not to pursue his grievance lacked factual support).

Plaintiff's sensationalist rhetoric on this point is unhelpful; the same can be said for his citations to the record. See ECF No. 130-1, ¶ 27 (not a single mention of fact-finding in the cited pages despite claiming that Bannister colluded with Amdur to deny Plaintiff a fact-finding hearing). His conclusory statements, such as the allegation that Amdur and Bannister "colluded to deny plaintiff a fact-finding [hearing]" borders on frivolous or a deliberate misrepresentation to the court. There is not a single document or line of testimony that supports that fact. Nor is there any evidence in the parties' voluminous submissions indicating Bannister colluded with Amdur to deny him his right to seek arbitration.

In sum, Plaintiff's collusion claims are an unsupported hunch. There is zero factual support for the proposition that Amdur or AAUP colluded with the defendants or facts demonstrating hostility, or arbitrariness. *Vaca v. Sipes*, 386 U.S. 171, 177 (1967).

Therefore, Defendants' motion with respect to Plaintiff's Title VII hostile work environment claim is granted. Having resolved all Plaintiff's avenues to Title VII liability, for clarity of the record, the court grants Defendants' motion for summary judgment as to the entirety of Plaintiff's Title VII claims.

### G. <u>Plaintiff's Fourteenth Amendment Claims</u>

#### 1. <u>Due Process – Termination</u>

Plaintiff does not seek money damages against the individual defendants in their official capacities. *See* Pl.'s Mem. In Opp. at 14 ("[P]laintiff's claims against the individual defendants, for money damages, is made against them in their 'individual capacities.'").

Instead, he seeks money damages against the individual defendants in their individual capacities and injunctive relief against the individual defendants in their official capacities. For the reasons contained herein, both claims fail.

Tenure, once conferred, is a property interest protected by the Due Process Clauses of the Fifth and Fourteenth Amendments. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 576-77 (1972); *Slochower v. Bd. of Higher Educ.*, 350 U.S. 551 (1956). Under the Due Process Clause of the Fourteenth Amendment, before a tenured public employee can be terminated, the "tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).

Amdur, Plaintiff's union representative, received notice of the investigation into Plaintiff's conduct. ECF No. 121-4, Amdur Dep. Tr. 122:17-23; ECF No. 121-11, pg. 101. On April 16, 2018, Dean Elliott met with Plaintiff and Amdur to provide them with OIE's final report. ECF No. 130-1, ¶ 22. On May 22, 2018, OUC issued its final report on its investigation, which incorporated the OIE investigation, relied on the nine-page report of the auditors regarding the financial aspects. That report was provided to the Plaintiff. ECF No. 130-1, ¶ 24. Therefore, Plaintiff had a representative through his union,[40] written notice of the charges, and an explanation of the employer's evidence.

The parties disagree that Plaintiff was provided an opportunity to present his side of the story. However, Plaintiff resigned before he could avail himself of the allotted procedures available to him. The court finds *Narumanchi v. Bd. of Trustees of*

---

[40] It appears he had legal counsel as well. ECF No. 121-11, pg. 264; Gopal Dep. Tr. 17:1-10.

*Connecticut State Univ.*, 850 F.2d 70, 72 (2d Cir. 1988) persuasive.  Whether Plaintiff

was counseled by his attorneys and/or his union representative to resign and what, if

anything, was told to him about his chances of prevailing at arbitration does not implicate

the defendants in this case.  As articulated above, the record is devoid of facts

establishing collusion between AAUP and any of the defendants in this case.

Furthermore, "[i]f an employee resigns voluntarily, he was not deprived of a

property (liberty) interest without due process. The court's inquiry must focus on

voluntariness.  Resignations are presumed voluntary unless (a) forced by coercion or

distress or (b) obtained by deception or fraud." *Hargray v. City of Hallandale*, 57 F.3d

1560, 1568 (11th Cir. 1995).  "Resignations can be voluntary even where the only

alternative is facing possible termination for cause or criminal charges." *Id.*; *see Giglio v.

Dunn*, 732 F.2d 1133, 1134-35 (2d Cir. 1984).  Plaintiff does not argue that his resignation

was coerced (apart from his now disposed of constructive discharge claim); he only

argues that it was the result of bad advice from his union representative, a non-party.  Nor

is there a factual basis for his argument that the union colluded with the university to deny

Plaintiff his right to fair and sufficient process.

Plaintiff does argue he was entitled to a fact finding hearing.  *See, e.g.,* ECF No.

125-2, ¶ 61.  Tellingly, in support of that proposition, he does not cite the UConn-AAUP

CBA.[41]   Instead, he cites the deposition testimony of Defendant Elliott who said *there

was a fact-finding hearing*.  He also cites Amdur's testimony, but that is equally unavailing.

Amdur testified that Article 27 of the CBA *did not require* a fact finding hearing.

---

[41] There is no mention of a "fact finding" hearing or meeting in the CBA.  *See* ECF No. 125-16, Amdur Dep.
Tr. 150:18-21; ECF No. 125-18, pgs. 43-44.

Specifically, he said "they *could* have a fact-finding meeting," but that Article 27 did not necessarily require it. *See* ECF No. 125-16, Amdur Dep. Tr. 150:18-21.

But there is no *genuine* material dispute of fact that the plaintiff received a hearing pursuant to Article 27 of the CBA between his union, AAUP, and the University. *See, e.g.,* Amdur Dep. 22:1-17; 66:2-8; 82:13-15. While Plaintiff's brief in support of his motion for summary judgment makes no mention of cross-examination, his responses to Defendants' statement of facts assert Plaintiff was entitled to call and cross examine witnesses. Despite this claim, he does not cite a single case in which a similar property deprivation required the right to cross-examine. Instead, Plaintiff reiterates the same hollow hunch that his union, a non-party to these proceedings, colluded with the University. Courts are not required to accept bald assertions completely unsupported by evidence when considering whether to grant summary judgment. *See Shalom v. Hunter College of the City Univ. of N.Y.*, 645 Fed. Appx. 60, 62*; Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002) (mere allegations or conclusory statements unsupported by facts are insufficient to defeat motion for summary judgment).

Furthermore, Plaintiff received the opportunity to comment on a draft of the final investigatory report. ECF No. 145-1 (*Plaintiff's Counterstatement to Defts' Addtl. Facts*) ¶ 19. At the hearing on June 1, 2018, Plaintiff had the opportunity to make statements in his defense. ECF No. 141-10, pgs. 147-151. Those arguments notwithstanding, Dean Elliott recommended termination of Plaintiff's employment. *Id.*

Plaintiff then appealed the decision to Provost Kennedy. On August 16, 2018, he attended a hearing. He submitted a written appeal, including the statement "I apologize profusely for the instant messages that I exchanged with [Burk]. These dozen or so

messages over the course of about four years were moments of weakness and stress I was facing." ECF No. 141-10, pgs. 318-20.

In sum, Plaintiff received notice of the charges against him, the sum of the evidence against him, an interview to tell his side of the story, an opportunity to comment on the investigatory report, a hearing wherein he was permitted to tell his side of the story, and an appellate process that allowed him to challenge Dean Elliott's decision. Plaintiff voluntarily resigned before Provost Kennedy's decision was final. Therefore, Defendants' motion for summary judgment is granted as to Plaintiff's Fourteenth Amendment Due Process claim.[42]

Even if the court were to accept that there are existing issues of a material fact, qualified immunity would apply. *Tooly v. Schwaller*, 919 F.3d 165, 175 (2d Cir. 2019).

## 2. Due Process – Stigma Plus

Liberty "denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." *The Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 572 (1972). Damage to reputation may prevent a former employee from engaging in "the common occupations of life." *Id.*

---

[42] Plaintiff *did not* move for summary judgment on his procedural due process claim as to the "bad standing" moniker. ECF No. 125-1, pgs. 22-26. He raises stigma-plus claim in response to Defendants' motion for summary judgment.

But *Roth* cannot be interpreted to require a hearing for any statement made about any employee at any time. Instead, the defaming statement needs to be made in the course of the termination of employment. *Paul v. Davis*, 424 U.S. 693, 709-10 (1976).

A defamatory statement is not sufficient to find liability. After all, defamation is a well-trodden cause of action maintained across the several states and the "Fourteenth Amendment [is not] a font of tort law to be superimposed upon whatever systems may already be administered by the States." *Id. at 701.* Thus, the Supreme Court in *Paul* articulated that a plaintiff must allege loss of reputation *plus* dispossession of a "right or status previously recognized by state law." *Id.* at 711.

"[S]tigma plus is a species within the phylum of procedural due process claims . . . in order to bring a successful stigma-plus claim, the plaintiff . . . must demonstrate that [some tangible interest] was deprived without due process of law." *Segal v. City of New York*, 459 F.3d 207, 213 (2d Cir. 2006). In response to Defendants' motion for summary judgment, Plaintiff argues that defendants published false and malicious findings that he violated their policies and resulted in negative media coverage that led to plaintiff's inability to find comparable employment in his field.

The United States Court of Appeals for the Second Circuit has reminded district courts that the "deleterious effects [flowing] directly from a sullied reputation," including "economic harm," *Sadallah v. City of Utica*, 383 F.3d 34, 38-39 (2d Cir. 2004), and "damage to a plaintiff's job prospects," *Watson v. Grady*, No. 09-cv-3055 (KMK), 2010 U.S. Dist. LEXIS 103473, 2010 WL 3835047, at *21 n.11 (S.D.N.Y. Sept. 30, 2010), cannot themselves constitute the "plus." Establishing the "plus" requires "specific and adverse [state] action clearly restricting [his] liberty—for example, the loss of

50

employment." *Velez v. Levy*, 401 F.3d 75, 87-88 (2d Cir. 2005); *see Sadallah v. City of Utica*, 383 F.3d at 38-39.

Plaintiff brings his claims against Defendants Herbst, Kennedy, Elliott, and Reitz – but not Gelston.  *See* Compl., ¶¶ 95 - 98.  As a preliminary matter, he does not demonstrate a material dispute of fact stigmatizing statements attributable Defendants Herbst, Kennedy, and Elliott.[43]

There is not a single statement of fact with respect to Defendant Reitz in Plaintiff's statement of facts.  *See, generally,* ECF No. 125-2.  Plaintiff makes one passing reference to her in the introduction of his memorandum in support of his motion and neglects to mention her again.  *See, generally,* ECF No. 125-1 Therefore, Plaintiff's motion for summary judgment is denied as to Defendant Reitz.

While Plaintiff claims he can disprove the statements made by Reitz to the press, her statements merely recount what the University did and what the investigations found.  There is no *genuine* issue that "[t]he university was in the process of terminating the department head's employment, but he resigned shortly before that process was completed and is no longer employed by UConn," or that "the audit found that the department head violated existing UConn policies; this misconduct was not due to a lack of applicable policies." ECF No. 141-10, pg. 329.

The plaintiff's briefing is also confusing and imprecise.  While he claims, "[t]he defendants' published false and malicious findings that he violated their policies and

---

[43] For example, in response to Defendants' Statement of Fact "Herbst was not involved in the response to the press and was unaware of Attorney Parenteau's letter to the Courant about the Plaintiff.  Herbst was not involved in the press communications- Reitz did not consult her and she never saw them before they were sent," Plaintiff responded that "Herbst is responsible for all communications from UCONN" and cited six pages of deposition testimony.  None of what Defendant Herbst said in those pages support Plaintiff' contention that she was "responsible for all communications;" in fact, she testified that she was not consulted before the relevant statement was made to the press.

resulted in negative media coverage," he neither identifies the policy nor specific statement that was false and malicious. He appears to claim that it was Reitz's statement that he violated University policies, but all Reitz indisputably said was "[t]he audit found that the department head violated existing UConn policies; this misconduct was not due to a lack of applicable policies." That finding is not in dispute. *See Waronker v. Hempstead Union Free Sch. Dist.*, 788 F. App'x 788, 794 (2d Cir. 2019) (affirming dismissal of stigma-plus claim where employee failed to identify false statements where worker does not seriously contest it "beyond conclusory assertions").

Finally, Plaintiff was not terminated by the university; he resigned his employment. Therefore, he cannot a maintain a stigma plus claim that is predicated on his loss of public employment. *See, e.g., Siegert v. Gilley*, 500 U.S. 226, 234 (1991) (no liberty interest implicated when alleged government defamation occurred subsequent to plaintiff's voluntary resignation from government employment); *see also Cendan v. School Board of Broward County, Florida*, 628 F. Supp. 3d 1191 (S.D. Fla. 2022) (teacher who retired when offered option to retire, resign, or be terminated did not suffer termination or significant alteration of legal status).

Therefore, the court grants summary judgment consistent with Defendants' motion.

### 3. Equal Protections

"The Equal Protection Clause of the Fourteenth Amendment is essentially a direction that all persons similarly situated should be treated alike." *Brown v. City of Syracuse*, 673 F.3d 141, 151 (2d Cir. 2012) (cleaned-up). "The elements of [a Title VII claim] are generally the same as the elements of [an equal protection claim,] . . . the two must stand or fall together." *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004) (citations

omitted).  That is because  "[i]n the context of a § 1983 suit where 'the color of state law is established, [an] equal protection claim parallels [a] Title VII [employment discrimination] claim.'" *Abdul-Hakeem v. Parkinson*, 523 F. App'x 19, 20 (2d Cir. 2013) (quoting *Feingold*, 366 F.3d 159, 159 (cleaned-up).  Defendants' motion is granted given that the plaintiff merely rehashes the arguments that failed to support his Title VII claim.

### III.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED.**

**IT IS SO ORDERED** at Hartford, Connecticut, this 31st day of March, 2025.


_____/s/_____
Omar A. Williams
United States District Judge

53